UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 4:19-cr-14-CLC-SKL |
| | ) | |
| JOSHUA'A RAMELLE VAUGHN | ) | |
| and | ) | |
| SEAN DORIAN SHINN | ) | |

## REPORT AND RECOMMENDATION

Pursuant to Federal Rule of Criminal Procedure 12(b)(3) (C), Defendants Joshua'a Ramelle Vaughn ("Vaughn") and Sean Dorian Shinn ("Shinn" and collectively with Vaughn, "Defendants") filed a joint motion (1) to suppress evidence, (2) for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and (3) to dismiss or transfer venue [Doc. 25]. Plaintiff United States of America (the "Government") filed a response in opposition to the motion [Doc. 30]. Defendants filed a joint reply [Doc. 33]. The Court held a *Franks* hearing beginning on August 14, 2019, which continued on August 26, 2019. Post-hearing briefs [Docs. 43, 47, 49, 51] have been considered and this matter is now ripe. For the reasons stated herein, I **RECOMMEND** that Defendants' joint motion to suppress be **DENIED**.

## I. BACKGROUND

This is a classic case of finding oneself in the wrong place at the wrong time—that is, the middle of a surveillance/apprehension operation being conducted by the Metro Nashville Police Department ("MNPD") and the 17th Judicial District Drug Task Force ("Task Force"). During the evidentiary hearing, the Government offered the testimony of the following law enforcement officers: MNPD Detective Robert Ruiz ("Detective Ruiz"), Task Force Special Agent Jose Ramirez ("SA Ramirez"), Task Force Special Agent Kyle Brewer ("SA Brewer"), and Task Force

Assistant Director/Special Agent Shane George ("SA George"). Pursuant to a stipulation with the Government, Defendant offered a stipulation of prior sworn testimony of Task Force Special Agent John Lasater ("SA Lasater"). The witnesses all agreed on the basic story, although certain differences will be highlighted below. The inconsistencies in the testimony noted below go to the strength of certain testimony, but I do not find the inconsistencies prove the pertinent testimony is untrustworthy. The following summary is based on the witnesses' collective testimony.

On July 12, 2018, the MNPD—particularly Detective Ruiz with the MNPD Gang Unit—was trying to locate and arrest Marquavis Lytle ("Lytle"), an indicted black male believed to be involved in certain dangerous gang related drug trafficking and violent shootings in the Nashville area. Prior to July 12, the MNPD had obtained a court order for "real time" location data for a telephone number used to facilitate a controlled purchase of heroin from Lytle in April of 2018.[1] Based on cell site location data received as a result of the court order, the agents concluded Lytle was traveling from Nashville to a specific portion of Building 5 of the Park Trail Apartments in

---

[1] Additional facilitation of certain drug transactions took place over the tracked cell phone in late June and the MNPD believed the phone remained in Lytle's possession in July. "Cell-phone location tracking refers to all methods of tracking a cell phone, including gathering cell-site location information (commonly referred to as CSL or CSLI) and tracking satellite-based Global Positioning System (GPS) data. CSL data are generated when a cell phone connects with a cell tower in order to make or receive a call; a phone may connect to and disconnect from multiple towers during the course of a phone call if, for example, the caller is in motion during the call. GPS data, on the other hand, do not come from a cell tower. Rather, GPS data reveal the latitude and longitude coordinates of the cell phone, regardless of whether a call is in progress, as identified by satellites orbiting the Earth that connect to the phone. A cell phone's GPS location can be identified so long as the phone has GPS functionality installed (as smartphones almost universally do), the phone is turned on, and the GPS functionality is not disabled. Finally, 'pinging' is a word that may refer in some contexts to a cell phone's connecting to a cell tower (e.g., 'the phone pinged the tower'), and in other contexts to a service provider's act of proactively identifying the real-time location of the cell phone when the cell phone would not ordinarily transmit its location on its own (e.g., 'AT&T pinged the phone')." *United States v. Riley*, 858 F.3d 1012, 1014 n.1 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 2705, 201 L. Ed. 2d 1099 (2018).

Shelbyville, Tennessee, an area in the purview of the Task Force. The portion of Building 5 at issue consisted of four apartments, with two upstairs and two downstairs. However, the agents did not know which of the four apartments in Building 5 might be at play for locating Lytle.

After Lytle's phone was tracked to the Park Trail Apartments in Shelbyville on a few occasions, MNPD requested local assistance from the Task Force about a week prior to July 12. MNPD still planned to find and arrest Lytle in Nashville if possible. These plans changed around 2:00 to 2:30 a.m. on July 12, when Detective Ruiz contacted SA Brewer by telephone to let him know the location data indicated Lytle was again at Park Trail Apartments. As the data indicated the cell phone was no longer mobile, Detective Ruiz thought Lytle would stay at the apartment complex for the night and could be apprehended in the morning. A decision was made to attempt to arrest Lytle on the outstanding warrants at the Park Trail Apartments.

As a result, sometime around 5:00 or 6:00 a.m., about eight law enforcement agents with the MNPD and the Task Force held a "briefing session" for a joint surveillance/apprehension operation. The briefing included at least a picture of Lytle and a general description of De Angelo Young ("Young"), a known associate of Lytle's. Detective Ruiz relayed that Young had been indicted in conjunction with the indictments issued for Lytle, and that Young also had outstanding arrest warrants. During the briefing, Detective Ruiz gave Task Force agents basic information about Lytle such as his weight, height, and that he has outstanding warrants for his arrest. The officers from MNPD and the Task Force then began their surveillance operation at Park Trail Apartments, with a focus on Building 5. It is unclear from the testimony whether the continuous surveillance at Building 5 started around 6:00 a.m. or as late as 6:50 a.m.

During the surveillance and before anyone was seen entering or leaving Building 5, a black Chevrolet Equinox in the parking lot was identified as suspicious by SA Brewer because it had a

3

Florida tag and was determined to be a rental car. Various witnesses testified about the reasons why such a rental vehicle is suspicious for potential involvement in gang drug trafficking. Task Force agents also testified an out-of-state rental vehicle in not typically observed at an apartment complex in Shelbyville.

After the surveillance began, a black male was observed leaving Building 5 and driving from the apartment's parking lot in the suspect rental car. The agents' testimony about the length of their focused surveillance of Building 5 before the black male left in the rental car ranged from approximately 45 minutes to an hour, but the affidavit SA Brewer composed that day for a search warrant ("July Affidavit") indicates the timing could have been as short as 10 minutes.[2] It was undisputed, however, that the agents saw no other person leave Building 5 during their surveillance.

SA Brewer was part of the surveillance team that engaged in direct observation of the breezeway to the portion of Building 5 at issue based on the location data. Detective Ruiz was parked away from Building 5 near the entrance to the apartment complex to monitor egress and ingress to the complex and could not observe the breezeway. Via cell phone contact, SA Brewer relayed to Detective Ruiz that a black male was leaving the complex in the suspicious rental vehicle.

---

[2] These timing inconsistencies have potential bearing because the telephone location data was sent in an email communication to Detective Ruiz every 15 minutes. The location data was shown on Google maps noting a radius for the location of the tracked cell phone. Google maps printouts showing the location data for the tracked cell phone before the driver left, while the driver was gone, and when the driver returned were made Government's Exhibits 1, 2, and 3. The various surveillance locations of the agents and related locations are noted on Government's Exhibit 2A.

4

As the black male drove out of the complex, Detective Ruiz briefly observed the rental car driver and realized the driver was not Lytle. However, he thought—it turns out incorrectly—that the driver looked like Lytle's associate, Young. Detective Ruiz decided not to stop, or even follow, the rental vehicle since Lytle, the focus of their operation, was not the driver. Detective Ruiz explained that Lytle was his focus because he held "rank" in the gang and had ordered "a lot of violence and shootings." Detective Ruiz supposed the driver (thought to be Young) was coming back (perhaps with food) and could be arrested upon his return. Detective Ruiz reported via cell phone to SA Brewer that the driver was not Lytle, but was Young. SA Brewer relayed this information to the other Task Force agents by car radio.

A short time after the male driver left the apartment complex, Detective Ruiz viewed updated location data from the tracked cell phone. Detective Ruiz reported (again via cell phone) to SA Brewer (who again communicated with other Task Force agents by radio) that the tracked cell phone was mobile and no longer at Building 5. As no other person had been observed leaving Building 5, Detective Ruiz concluded the tracked cell phone left with the black male in the rental vehicle, which reinforced his conclusion that Young was the driver. The surveillance team formed a plan to detain the black male if he returned to the apartment complex as expected and to then look for Lytle who they still thought might be in one of four apartments in the relevant portion of Building 5.

The black male driver did return anywhere from 10 to 25 minutes later and was observed speaking to another individual in the parking lot. The rental vehicle stopped in the parking spot next to SA Ramirez's parked undercover vehicle. SA Ramirez exited his vehicle, approached the rental vehicle, and detained the driver, who he believed was Young and the subject of outstanding

arrest warrants. For ease of reference, the driver—who turned out to be Vaughn and not Young—will be referred to as Vaughn to describe what happened next.

When Vaughn was detained, all of the agents left their surveillance posts and began to converge. The witnesses' testimony was somewhat inconsistent regarding exactly how long it took for the various agents to converge. There was also some imprecise testimony regarding the manner of their communications—radio, telephone, or in person—once the agents were out of their respective cars.[3] The testimony was clear, however, that the arrest of Vaughn and the following events took place concurrently or in rapid succession.

As noted, SA Ramirez was conducting his surveillance duties from an unmarked parked car in the parking lot near Building 5. Vaughn parked next to SA Ramirez when he returned to the complex. SA Ramirez handcuffed Vaughn immediately after Vaughn exited the rental vehicle and did not ask him his name. Most of the witnesses referred to this as an arrest. After SA Ruiz had conducted a pat down of Vaughn, Detective Ruiz drove up to join SA Ramirez. SA Ruiz arrived at the scene of the detention of Vaughn either within seconds according to SA Ramirez or within minutes according to Detective Ruiz.

Upon approaching Vaughn, Detective Ruiz immediately realized Vaughn was not Young. Detective Ruiz testified he immediately informed the officers at the arrest scene that the detained person was not Young. Detective Ruiz did not know who Vaughn was. SA Ramirez testified that

---

[3] Although somewhat contrary to SA Ramirez's testimony, I **FIND** the credible testimony to be that Detective Ruiz was not on the dedicated, closed radio channel used by the Task Force agents, and that Detective Ruiz and SA Brewer communicated by cell phone. SA George had a walkie talkie that he wore on his person and also had a base radio unit in his vehicle to monitor communications. Both SA Brewer and SA Ramirez had base radio units in their respective car, but no walkie talkie for radio communications on their person. SA Brewer had a cell phone on his person.

Detective Ruiz told him that Vaughn was not Young after other Task Force officers were already headed for Building 5 in this rapid series of events. Detective Ruiz began interrogating Vaughn at or near the parked rental vehicle. Vaughn gave Detective Ruiz his name, but Vaughn had no identification to prove his claimed identity.

During the above action—as the rental car was parking near Building 5—SA Brewer left his car and ran from his surveillance location across a playground toward Building 5. He did not go to Vaughn who was being arrested by other officers, because he focused on detaining a black male in a Charger, who had been observed exchanging a friendly wave or pleasantries with Vaughn in the parking lot prior to Vaughn's detention. SA Brewer described the interaction between Vaughn and the neighbor as taking place "pretty much simultaneous" with the arrest of Vaughn.

Bypassing Vaughn's arrest and before ever communicating with Detective Ruiz about the identity of the arrestee, SA Brewer quickly detained, patted down, and questioned the neighbor. SA Brewer described this as asking the neighbor who he was, what his business at the complex was, having the neighbor put his hands of the Charger and searching or patting him down for weapons, i.e., "the whole deal." After the neighbor said he lived at the complex and was coming home from work, SA Brewer asked him "how he knew the guy that he just waved at." The neighbor responded that he did not really know him, but had seen him around and that he (Vaughn) stayed at the downstairs apartment on the right. SA Brewer—who still thought Vaughn was Young—did not know the downstairs apartment on the right was the apartment frequented by Vaughn until this interaction with the neighbor. SA Brewer's questioning of the neighbor took place in "full view" of the arrest of Vaughn, i.e., the neighbor could see the police action around Vaughn.

7

Meanwhile, and in accordance with the predetermined plan, SA George, SA Lasater, and perhaps another officer, headed from their surveillance locations to the apartments of interest (i.e., not to Vaughn) in order to engage in a knock and talk to attempt to locate/arrest Lytle. SA George testified that he chose to proceed to the apartments because he planned to do a knock and talk—if necessary, at all four apartments of interest. At the time, SA George still believed the arrested rental car driver was Young. SA George also knew that Lytle was not in the rental car as the driver was the sole occupant. SA George thought Lytle might be in Building 5 even though he also knew the tracked cell phone had been reported mobile/moving with the rental vehicle.

As SA George quickly moved toward the breezeway, SA Brewer relayed in person to SA George that the neighbor said Vaughn stayed in the right, bottom floor apartment, which is Apartment 56. SA George testified that even without the neighbor's information, he would have started his knock and talk routine at one of the two bottom floor apartments and then proceeded to the other before going to the two top floor apartments.

After he relayed the neighbor's information to SA George in person, SA Brewer joined Detective Ruiz. It was only then that SA George learned from Detective Ruiz that Vaughn was not Young. All of the pertinent witnesses testified that Detective Ruiz realization that Vaughn was not Young was not relayed to SA George by anyone until after the knock-and-talk encounter discussed below.

As noted above, when the rental vehicle parked and Vaughn's arrest was initiated, SA George and SA Lasater began their approach to the pertinent breezeway of Building 5. On their way, SA Brewer told them the neighbor said the rental car driver stayed in the bottom floor apartment on the right, i.e., Apartment 56. SA George went straight to, and knocked on the front door of, Apartment 56. Concerning his role in the knock and talk, SA George testified that before

8

knocking, he sniffed the air to determine if he could detect an odor of marijuana as was his custom. He could not detect an odor of illegal drugs from outside the closed door. He also took precautions to stand to the right side of the door when knocking because he knew Lytle was a dangerous fugitive. As a result, when the door first opened SA George could not see into the apartment and the occupant of the apartment could not see him.

In response to his knock and to SA George's surprise, a male, later identified as Shinn, opened the door about a foot wide. Although SA George had not detected the odor of marijuana when the door was closed, as soon as the door opened SA George noticed the smell of both raw and burnt marijuana emanating from the apartment. When Shinn saw the police were at his door, he quickly attempted to shut the door to terminate the encounter. As Shinn attempted to close the door, however, SA George blocked it from shutting and informed Shinn that he needed to step inside and speak with him regarding the odor of marijuana coming from the apartment.

In doing so, SA George saw a small amount of marijuana residue and burnt roaches and a powder he suspected was heroin on the coffee table. SA George testified that based on the odor of marijuana, Shinn was detained and frisked. The agents conducted a protective sweep of, and secured, Apartment 56. The agents then remained in the kitchen with Shinn. When asked for consent to search Apartment 56, Shinn declined.

Between 10 to 20 minutes after SA George's initial knock on the door of Apartment 56, SA Brewer entered Apartment 56 for the first time. SA Brewer smelled marijuana while in the apartment. By this time, he had learned that Vaughn was not Young. SA Brewer informed SA George of this development. A decision was made for SA Brewer to seek a search warrant for Apartment 56.

9

SA Brewer returned to his office, typed his July Affidavit, and then sought a search warrant for Apartment 56 from Judge Forest Durard of the 17th Judicial Circuit Court. At 10:23 a.m., SA Brewer obtained a warrant to search Apartment 56 ("July Warrant").[4] Various evidence was located in the apartment when it was searched. It is undisputed that only a few burnt marijuana roaches and a very small amount of residue of raw marijuana was found in Apartment 56. The marijuana would have fit in a one-inch by one-inch bag and was deemed too insignificant to send to a police laboratory for testing.

During the hearing, the parties stipulated that the following portions of SA Lasater's[5] testimony from the state court preliminary hearing could be considered in connection with the motion to suppress:

1. The description the officers were given of Lytle was that he was "a black male with dreadlocks."

2. Shinn opened the door "about a foot wide" and then attempted to shut the door and voluntarily terminate the police encounter.

3. Although the door was apparently only opened "a foot wide," SA Lasater noticed the distinct smell of marijuana.

4. SA George and SA Lasater intervened, preventing Shinn from closing the door.

---

[4] A marked up copy of the July Warrant and July Affidavit are attached to Defendants' joint motion [Doc. 25-1] and a clean copy was entered as Governments' Exhibit 6. Defendants argue the Government failed to produce the July Affidavit in discovery and suggest this is "troubling" because it indicates a motive to mislead and "casts a long shadow over the intent question related to the Government's conduct." [Doc. 51 at Page ID # 820 n.3]. SA Brewer testified he provided the July Affidavit to the U.S. Attorney's Office.

[5] As discussed, SA Lasater participated in the knock and talk on Apartment 56 with SA George, which resulted in the interaction with Shinn.

5. SA Lasater admitted that there was only marijuana residue, or "shake," on the coffee table.[6]

In December 2018, SA Brewer prepared a second affidavit ("December Affidavit") and a warrant ("December Warrant") was issued for the search for and seizure of data from the tracked cell phone, which was one of several cell phones seized on July 12 [Doc. 25-2].[7]

On April 9, 2019, Defendants were charged with conspiracy to distribute fentanyl and heroin, possession with intent to distribute more than 40 grams of fentanyl and more than 10 grams of heroin, and with possessing a firearm in furtherance of a drug trafficking crime. Vaughn is also charged with being a felon in possession of a firearm.

## A.    July Warrant

As relevant to the instant motion, the "four corners" of the July Affidavit allege:

<u>EXPERIENCE AND BASIS OF KNOWLEDGE OF AFFIANT</u>

I, Kyle Brewer, have been employed as a Law Enforcement Officer in the State of Tennessee since May 2008. I have been employed as an Agent with the 17th Judicial District Drug Task Force (17th DTF) since November 2015. Prior to my employment with the 17th DTF, I was employed as an agent with the 12th Judicial District Drug Task Force. I am currently assigned as a Task Force Officer for the Drug Enforcement Administration Resident Office in Chattanooga, Tennessee. I have been a DEA Task Force Officer since June 2012. During my tenure as a Narcotics Agent and Task Force Officer, I have gained a working knowledge in narcotics trafficking methods and techniques. During this time, your affiant has been to numerous police and narcotics investigation schools. . . . Through my training

---

[6] This was alternatively described as "…a small amount of marijuana[.]"  The stipulation is from Defendants' joint motion [Doc. 25 at Page ID # 117-18, 118 n.4] and the recording of the preliminary hearing was made Defendants' Exhibit 2.

[7] A marked up copy of the December Warrant and December Affidavit are attached to Defendants' joint motion [Doc. 25-2] and a clean copy was made Defendants' Exhibit 1.

11

and experience I have gained a working knowledge of what certain controlled substances look like as well as the odor that the controlled substances may be emitting. Moreover, as it relates to the smell of both raw and burnt marijuana, I have been exposed to those odors at least 500 times in my career and am very familiar with the same. Further, your affiant has conducted and participated in numerous narcotics investigations while serving as a narcotics investigator that have led to convictions, asset forfeiture, and drug seizures.

## STATEMENT OF FACTS IN SUPPORT OF PROBABLE CAUSE

***

Your affiant, along with agents of the 17th Judicial District Drug Task Force were at Park Trail Apartments to serve an arrest warrant on a fugitive from Davidson County, Tennessee. Nashville Metropolitan Police Department had contacted your affiant in regards to the wanted fugitive. Agents arrived at Park Trail Apartments around 6:50AM on July 12, 2018. At approximately 7:00AM, agents observed a black male exit building 5 and walk to a Black Chevrolet Equinox with Florida tags. Metro-Nashville Officers were familiar with the black male subject and stated that he also had warrants out of Davidson County, Tennessee. The black male drove away from the Park Trail Apartment Complex while agents continued to conduct surveillance on building 5. After approximately 15 minutes, agents observed the black male arrive back at the complex and park in the same location. Once the black male exited the vehicle, agents approached the subject and took him into custody without incident.

Subsequently after taking him into custody, your affiant spoke with a neighbor at Park Trail Apartments, and that neighbor stated that the subject lived in apartment 56 and identified the apartment as the one under the stairwell on the ground floor.

While agents spoke with the black male in the parking lot, Assistant Director Shane George and Special Agent John Lasater approached and knocked at the front door of apartment 56. The door was opened by a black male. At that time AD George noticed the very strong of marijuana emitting from the interior of the residence. AD George

12

informed the subject that he needed to step inside and speak with him about the odor of coming from the apartment. While standing in the doorway to the apartment AD George noticed marijuana and suspected heroin on the coffee table in plain view. Also several items of paraphernalia were seen inside the residence. AD George ordered the subject to put his hands up and subsequently placed him in handcuffs. Agents then conducted a protective sweep of the residence for officer safety and that sweep produced negative results. The subject stated that he was there staying with his cousin, who was the male subject that had been arrested in the parking lot by agents.

As a part of the overall investigation your affiant entered the subject apartment shortly after AD George's entry. Upon entry to the apartment your affiant smelled, based on his training and experience, the distinctive odor of both raw and burnt marijuana.

## OTHER INFORMATION PERTINENT TO THIS INVESTIGATION

Your affiant has been briefed about the ongoing criminal investigation into the location to be searched and the subject that was taken into custody. This location is believed to be a stash location for the subject that was arrested in the parking lot with outstanding felony warrants out of Davidson County, Tennessee.

[Doc. 25-1 at Page ID # 135-37 (without corrections)].

During the hearing, SA Brewer admitted that at the time he drafted the July Affidavit he knew Vaughn was not Young. No proof was submitted to indicate Vaughn was the subject of any outstanding arrest warrants. As a result, SA Brewer's statement in the July Affidavit that the male detained in the parking lot had outstanding felony arrest warrants is false. SA Brewer's offered explanation for the inclusion of this information essentially was that he made a mistake.

**B.    December Warrant**

SA Brewer's December Affidavit in support of the December Warrant alleges the following:

13

<u>Facts, Statements and Circumstances in Support of Probable Cause</u>

On July 12, 2018, 17th Judicial District Drug Task Force (17th DTF) agents, along with Metro-Nashville Police Department (MPD) Detectives in an attempt to serve an arrest warrant at Park Trail Apartments located in Shelbyville, Tennessee.

MPD Detective Robert Ruiz and other detectives with MPD had gathered historical cell site data and determined the location of a violent gang member and heroin trafficker identified as Marquavis LYTLE, as part of an ongoing investigation is Nashville, Tennessee. A court order was obtained July 2, 2018 by detectives with MPD for location data of the Target Telephone. The Target Telephone was previously contacted to make controlled purchases of heroin from LYTLE during the investigation. Historical ping data showed that the device was coming to an apartment located at Park Trail Apartments located at 1601 Green Lane in Shelbyville, Tennessee.

\*\*\*

At approximately 7:00AM, agents observed a black male exit building 5 of Park Trail Apartments and enter into a Black Chevrolet Equinox with Florida tags and determined that this was a rental vehicle. Detective Ruiz stated that it was not LYTLE, but looked to be his partner, De Angelo YOUNG. The black male drove away from the apartment and left the area. Detective Ruiz then determined that the device was no longer located at Building 5 after receiving updated location data. Detective Ruiz and SA Brewer made the decision that if the black male came back to the apartment that agents would take him into custody for outstanding warrants in Davidson County.

Outside the apartment, Detective Ruiz had determined that the black male subject that exited the vehicle was not YOUNG. The black male gave Detective Ruiz the name of Josh VAUGHN. Detective Ruiz and SA Brewer explained to VAUGHN that he was being detained while agents applied for a search warrant for the apartment. VAUGHN was advised of his rights by Detective Ruiz at this time.

At that time, SA Brewer returned to the 17th DTF office in Shelbyville, Tennessee and prepared a State search warrant affidavit based on the previous events. At approximately 10:20AM, SA

14

Brewer met with 17th Judicial District Circuit Court Judge Forest Durard at his office in Shelbyville, Tennessee for review of the affidavit. Judge Durard granted SA Brewer with a search warrant to search Apartment 56 of Park Trail Apartments.

At approximately 10:40AM, SA Brewer returned to the apartment to execute the search warrant and agents began conducting the search of the apartment.

As a result of the search, two clear plastic bags containing suspected heroin (Exhibit 1) located in the kids bedroom, a small plastic bag containing suspected heroin (Exhibit 2) was located on the coffee table in the living room. A Glock 9mm pistol (Serial ZWV050) loaded, a Glock 45 caliber pistol (Serial MPW656) loaded, assorted ammo and magazines were located.

Additionally, $14,946.00 (Fourteen thousand nine hundred forty-six dollars) United States Currency was located in the same plastic tote with Exhibit 1. Also located in the search were five (6) sets of digital scales and numerous plastic baggies indicating resale in the kitchen. Two electric grinders were also located inside the tote with Exhibit l. Six cell phones were also located. A small amount of marijuana and items of drug paraphernalia were located during the search. These items were collected by the 17th DTF and transported to the 17th DTF for processing.

<u>Conclusion</u>

Therefore, considering the foregoing, your Affiant believes based upon his knowledge, training and experience probable cause exists to believe evidence of violations of Tennessee Code Annotated 39-17-417, Tennessee Controlled Drug Act will be found within the cell phones to be searched and may contain digital images, call logs, text content, or additional information which may be valuable in the successful prosecution of this case. . . .

[Doc. 25-2 at Page ID # 143-44 (without corrections)].

## II.    STANDARDS

Defendants' arguments are based on alleged violations of the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons [and] houses . . . against

unreasonable searches and seizures." U.S. Const. amend. IV.[8] Thus, warrantless seizures fail constitutional muster unless they qualify under one of several well-defined exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). A warrantless temporary involuntary detention (or *Terry* stop) must be predicated upon reasonable suspicion, and a warrantless arrest must be based upon probable cause. *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008)).

It is a longstanding rule that evidence obtained as a result of an unconstitutional search or seizure will be suppressed at trial. *See Weeks v. United States*, 232 U.S. 383, 398-99 (1914). However, the remedy of exclusion is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), to be used as a "last resort, not [a] first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

## III.   ANALYSIS

Defendants have moved for the entry of an order suppressing all evidence seized and any statements obtained as the result of the allegedly unlawful detention—i.e., without reasonable suspicion or probable cause—of Defendants' persons and the allegedly illegal search of Apartment 56 in July. Further, Defendants move to suppress all evidence that is fruit of the detention of Vaughn and the July search, including evidence obtained when executing the December Warrant. Defendants argue the unlawful detention of Vaughn resulted in the identification of Apartment 56, and ultimately, the execution of the July Warrant, which they contend is based on false and omitted

---

[8] The Government has not disputed that Defendants had a legitimate expectation of privacy in connection with the search of Apartment 56. *See United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (holding "a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988))).

16

material information.[9]   In addition, Defendants suggest the officers conducted an unlawful

protective sweep of Apartment 56.  Defendants also argue that if suppression is granted, venue in

this district is improper pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)(i).

### A.    Detention of Vaughn

Turning first to the detention of Vaughn, all seizures—including brief investigatory

stops—receive Fourth Amendment protection. *United States v. Beauchamp*, 659 F.3d 560, 566

(6th Cir. 2011).  The Supreme Court has long held "that searches and seizures based on mistakes

of fact can be reasonable."  *See Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) ("To be

reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part

of government officials, giving them 'fair leeway for enforcing the law in the community's

protection.'") (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949))).  *See also Illinois v.

Rodriguez*, 497 U.S. 177, 183-86 (1990).  The mistake may be one of law or fact, but is limited to

those made by "reasonable men."  *Heien*, 135 S. Ct. at 536.  Moreover, "the subjective intent of

the law enforcement officer is irrelevant in determining whether that officer's actions violate the

Fourth Amendment."  *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000).

---

[9] Responding to my inquiry during the hearings, Shinn argues he has "standing" to contest the detention of Vaughn because Vaughn's detention was used as a primary basis for the allegedly illegal search of Apartment 56 [Doc. 47].  Shinn also claims he was unlawfully detained a short time after Vaughn's illegal detention began because the search of Apartment 56 was illegal as a result of Vaughn's detention.  Shinn acknowledges he has no "direct standing" to challenge the seizure of Vaughn's person but submits that he has the authority to contest the unlawful detention of Vaughn to the extent that it was used to support an unlawful search of the Apartment 56 where he was a guest.  The Government did not address this threshold issue.  Given the Government's lack of opposition, I will not belabor the "standing" issue further.  Therefore, it is not necessary to address Shinn's separate argument that he has standing to contest the detention of Vaughn.

Officers may temporarily seize a person, often called a *Terry* stop, if the officers have "reasonable suspicion" of criminal activity stemming from "specific and articulable" facts the officers know at the time of the stop. *Terry v. Ohio*, 392 U.S. 1, 21-22, 27 (1968); *accord*, *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) ("[W]here a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances."). Though more than a hunch, reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "[A] pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox*, 839 F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (internal citation and quotations omitted). This is not a high bar—all that is needed is "a minimal level of objective justification" for the stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). *See also Navarette v. California*, 572 U.S. 393, 396-97 (2014). "There is no rigid time limit for a *Terry* stop," and when the police's "initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate." *Houston v. Clark Cty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999).

A probable cause determination depends on whether, at the moment of arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citations

18

omitted).  The reviewing court must assess probable cause "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (internal quotation marks and citation omitted).  It is the Government's burden to articulate facts sufficient to support the detention.  *See Brown v. Texas*, 443 U.S. 47, 52 (1979).

Defendants seemingly argue the officers were limited to a consensual encounter with Vaughn in the parking lot.  They contend the officers should have, at most, approached Vaughn in the parking lot, asked him his name, immediately determined he was not a sought-after fugitive based on his representation, in spite of his lack of identification (although driving a vehicle), and ended the encounter, rendering any information that Vaughn lived in Apartment 56 meaningless. They also contend the moment Detective Ruiz arrived and, upon closer viewing and in spite of his earlier misidentification, could see Vaughn was not Young, he should have immediately ended the encounter, also rendering any information that Vaughn lived in Apartment 56 meaningless.  They contend Vaughn's mere presence at the apartment complex where the police believed a fugitive might be located is not enough reasonable suspicion to justify an investigatory detention/arrest and that, even if he was reasonably detained at first, that suspicion vanished when Detective Ruiz told any other officer that Vaughn was not Lytle.  I respectfully disagree that Vaughn was unlawfully arrested or detained.

I **CONCLUDE** it is not necessary to discuss a *Terry* stop of Vaughn, at least in the context of his initial detention.  It is not at all clear that the Government even maintains the stop of Vaughn upon his return to the complex was merely a *Terry* stop.  SA Ramirez testified he was instructed to take "Young" into custody if Young returned to the complex based on the outstanding arrest warrants.  The witnesses testified Vaughn was arrested in accordance with their plan to do so

19

because they thought Vaughn was Young. SA Ramirez also testified that he *arrested* Vaughn when after Vaughn exited the rental vehicle.

Turning to the issue of probable cause for the arrest, the officers credibly testified that at the moment of Vaughn's arrest, they thought that Vaughn was Young and, thus, was the subject of active arrest warrants on guns or narcotics charges. Detective Ruiz concluded Vaughn was Young based on his quick glimpse of the driver through the windshield of the moving rental vehicle. This observation was bolstered by other circumstances, including that the officers were at the apartment complex tracking a cell phone known to have been used to facilitate controlled heroin purchases with Lytle, a dangerous fugitive, and known associate of Young, another known dangerous fugitive. The officers reasonably concluded the tracked phone became mobile around the same time the rental vehicle left the apartment complex. I **CONCLUDE** their identification (albeit mistaken) of Vaughn as being Young under the totality of the credible testimony and proven circumstances was reasonable.

I acknowledge that Defendants have shown some inconsistences in the witnesses' testimony concerning pertinent time estimates, indicating a *possibility* that the surveillance was conducted for only 10 minutes or so before Vaughn left in the rental car. As a result, because the location data was relayed every 15 minutes, there is a chance the tracked cell phone had gone mobile before the surveillance began. While there is potential to view the timing and Google maps/location data and come to somewhat different conclusions about what they show, I **FIND** Detective Ruiz's interpretation of the maps—as demonstrating that the tracked cell phone became mobile when Vaughn drove from the apartment complex—was reasonable and not effectively

discredited during the hearings.[10]  More importantly, the location data was not used to identify Vaughn as Young.  While the location data may have directed the officers to the portion of Building 5 at issue and even bolstered Detective Ruiz's conclusion that Vaughn was Young, it was Detective Ruiz's familiarity with Young and his personal observation of the driver as the rental vehicle drove past that led Detective Ruiz to believe in good faith that the rental vehicle was being driven by Young.  Defendants have not argued to the contrary.

Although not directly addressed by the parties, the Supreme Court has held that when "the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802 (1971) (citation omitted); *accord*, *King v. United States*, 917 F.3d 409, 422-23 (6th Cir. 2019)*;see also United States v. Rosario*, 305 F. App'x 882, 885 (3rd Cir. 2009); *United States v. Taylor*, No. 3:18-CR-173, 2019 WL 2330119, at *3-4 (S.D. Ohio May 31, 2019).  In *Rosario*, like here, at the time of a directed stop the officer had probable cause to believe a valid arrest warrant existed for a specific person suspected of a crime, that the suspect was in the vehicle at issue, and that the suspect and the defendant were the same person. 305 F. App'x at 885.  The Third Circuit Court of Appeals held that "[t]his alone was sufficient to establish probable cause to support the

---

[10] No testimony indicated exactly when on the day at issue Detective Ruiz determined from the location data that the phone returned to the apartment complex, but at some point, he did.  This will not be considered in connection with the probable cause to detain Vaughn as the testimony does not indicate officers knew at the time of Vaughn's arrest that the location data showed the tracked phone had returned to the staked-out area.  The tracked cell phone was seized during the July 12 search, but neither Young nor Lytle were found that day.  Detective Ruiz and SA Brewer testified that the tracked cell phone was located on July 12 on either Vaughn's person, in the rental vehicle, or in Apartment 56.  Neither the testimony nor the inventory sheet for the executed July Warrant, Government's Exhibit 7, clarifies exactly where the tracked cell phone was located on July 12.

directed stop of [the defendant's] vehicle," despite the officer ultimately being mistaken as to the defendant's identity. *Id.* (the warrant gave the officer probable cause to stop the vehicle of the defendant, even if no traffic offense had occurred and the officer was mistaken that the warrant was for the defendant).

Defendants have not contested the validity or constitutionality of the outstanding arrest warrant for Young. That the agents were reasonably mistaken in thinking Vaughn was Young does not negate that probable cause existed to make the stop. *See Hill*, 401 U.S. at 802; *Rosario*, 305 F. App'x at 885. The evidence presented at the hearing proves the Government's position that this was a case of mistaken identity, not a fabricated story to validate the detention. All of the testimony indicates that the arresting officers had a good faith and reasonable, articulable basis for believing that Vaughn was Young, and I so **FIND**.

Although it turned out to be a case of mistaken identity, at the moment of arrest, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the Vaughn had committed an offense. Thus, probable cause existed.[11] Vaughn's detention and handcuffing were reasonably necessary to ensure the officers' safety under the circumstances. Given the totality of the circumstances, I **FIND** the officers have articulated probable cause for the arrest.

---

[11] Although not addressed by the parties, I note it is permissible for one officer to rely on another officer's observations for purposes of establishing reasonable suspicion or probable cause. *See United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) (holding that for assessing whether probable cause exists, the court "mutually impute[s] the knowledge of all the agents working together on the scene and in communication with each other"); *accord United States v. Rodriguez-Suazo*, 346 F.3d 637, 650 (6th Cir. 2003); *see also Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) ("Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." (citing cases)).

While the probable cause for arrest on the outstanding warrant quickly dissipated when Detective Ruiz realized Vaughn was not Young, the evidence does not indicate Vaughn's initial detention lasted beyond the time necessary for the stop's purpose. The exact time when Detective Ruiz recognized Vaughn was not Young is not certain, but the evidence indicates this realization took place either during the same timeframe or just after the neighbor identified where Vaughn stayed, and that SA George was not informed of the realization until well after the knock and talk. Furthermore, Detective Ruiz could reasonably investigate and request identification from the driver of a suspicious rental car who was seen exiting from the breezeway of the suspected apartments at the same time the location data reasonably indicated the tracked phone was mobile. It is undisputed that Vaughn did not provide a driver's license or other identification to verify his identity in spite of operating the rental car.

Defendants' passing argument, which suggests Vaughn's detention was illegal since he was stopped solely because he was a black male in the staked-out area, is not supported by the facts or law. *See United States v. McElrath*, No. 18-2309, 2019 WL 4447582, at *4 (6th Cir. Sept. 17, 2019) ("McElrath was not simply walking in a high-crime neighborhood when officers saw him, nor was he merely in the general proximity of 637 Florence. Instead, he was steps away from both the target house and the location of the recent controlled drug buy. McElrath's close proximity to this circumscribed area—where specific criminal activity had occurred only an hour before— reasonably contributed to the officers' suspicion." (citing *United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006), *abrogated on other grounds by Cradler v. United State*s, 891 F.3d 659 (6th Cir. 2018) (finding facts supported reasonable suspicion where "the 'high-crime' area [wa]s circumscribed to a specific intersection rather than an entire neighborhood" and "the crimes that

frequently occur[ed] in the area [we]re specific and related to the reason for which [the defendant] was stopped")).

Moreover, the officers very quickly learned of the apartment where Vaughn was staying from a neighbor—not from Vaughn. That neighbor had just exchanged pleasantries with Vaughn, and the neighbor was detained and asked about the person he had just exchanged pleasantries with in the parking lot. Defendants argue that in order for the neighbor to direct law enforcement officials to Apartment 56, the neighbor had to know who the police were asking about, so Vaughn's detention was required for the neighbor to either see Vaughn in person or for the police to take a picture of Vaughn to show to the neighbor. Although the neighbor could see Vaughn's arrest, there is no evidence that the detention of Vaughn resulted in the neighbor being shown either Vaughn or a picture of Vaughn by SA Brewer. The uncontradicted testimony is that SA Brewer instead asked the neighbor about the person he just exchanged pleasantries with in the parking lot.[12]

Considering the totality of the circumstances, I **CONCLUDE** the officers' seizure and detention of Vaughn was reasonable and did not last longer than necessary for the purposes of the stop in the swiftly developing situation on July 12. Accordingly, I **RECOMMEND** denial of this aspect of the Defendants' motion.

---

[12] As to what happened next, Defendants do not firmly take the position that the detection of an odor of marijuana during the knock and talk is an insufficient basis for detaining them [*see* Doc. 33 at Page ID # 170-71 (discussion of "plain smell doctrine")]. Rather, they primarily argue the officers' claims about the marijuana odor are not credible, and that the officers had no valid reason to go to Apartment 56 to begin with. To the extent Defendants may be contesting their detention after SA George detected the odor of raw and burnt marijuana, the odor of marijuana and the totality of the circumstances were sufficient to justify both Defendants' detention while a warrant was sought, as discussed in more detail below.

### B.      Knock and Talk and Protective Sweep

Not every entry by police onto a suspect's property is a search.  There is an implied consent for the public, including police officers, to be able to approach an unobstructed residence and knock on the front door.  *Kentucky v. King*, 563 U.S. 452, 469-70 (2011).  "The Sixth Circuit recognizes the use of knock and talk consensual encounters as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation."  *United States v. Chapman*, No. 1:08-CR-42, 2009 WL 301906, at *3 (E.D. Tenn. Feb. 6, 2009) (internal quotation marks omitted) (quoting *United States v. Thomas,* 430 F.3d 274, 277 (6th Cir. 2005)).  When conducting a knock and talk, officers are permitted to see, hear, and smell whatever can be detected using their senses from a lawful vantage point.  *See California v. Ciraolo*, 476 U.S. 207, 213 (1986).

Explaining why he planned to—and immediately did—move toward the breezeway of the relevant portion of Building 5 when the arrest of Young (albeit really Vaughn) took place, SA George testified, "Well, the information I had is that these individuals were possibly involved in high-level drug trafficking, may be armed, and they were suspected gang bangers. Or if not suspected, verified gang bangers. And I knew that ultimately in my mind, the goal is to get -- try to get inside the residence or make contact with somebody inside this residence." [Doc. 37 at Page ID # 304].  SA George believed Lytle might still be in the apartment complex—even though he had been told the tracked cell phone had moved from the surveilled location, potentially in the rental vehicle that left—because he saw nobody else leave the pertinent Building 5 breezeway and he had been told Young (not Lytle) was the vehicle driver.  He testified he would have engaged in a knock and talk at all four apartments connecting to the breezeway (probably starting with the

25

two on the bottom) whether or not he had not been told that a neighbor identified the bottom right apartment.

SA George also testified that he is a trained narcotics officer with 20 years' experience and is familiar with the odor of both raw and burnt marijuana. SA George did not detect the odor of marijuana from outside the closed door to Apartment 56, but when the door opened about a foot wide in response to his knock, SA George noticed the "unmistakable" odor of both raw and burnt marijuana coming from the apartment. He still thought Lytle might be in Apartment 56. During this entire time, SA George credibly testified he did not know that Vaughn, who was being detained in the parking lot, was not Young.

Defendants have not directly disputed that the officers were lawfully able to attempt to engage in a voluntary discussion with any and all occupants of the apartments in Building 5 via a knock and talk encounter. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (noting a police officer not armed with a warrant may approach a home and conduct a knock and talk). Instead, Defendants contend that determining the particular apartment they stayed in from the neighbor while Vaughn was being detained somehow renders the knock and talk illegal. I find no support for this argument.

Regarding SA George's knock and talk, Defendants focus on alleged inconsistencies in the testimony about the various agents' detection of an odor of marijuana. Defendants essentially contend the agents' testimony is untrustworthy because: (1) SA Lasater testified that he smelled burnt marijuana in the state court proceedings and said one can tell a difference between burnt and raw marijuana [Doc. 51 at Page ID # 818 citing Defs' Ex. 2 (50:37)];[13] (2) SA Brewer testified

---

[13] This is not part of the stipulated testimony, but accepting this testimony does not change the outcome.

that he could only recall smelling the odor of raw marijuana in Apartment 56 although his July Affidavit mentions both burnt and raw; and (3) SA George testified that he smelled both the odor of burnt and unburnt marijuana.  In conjunction with this argument, Defendants also point out that the Government's response to the joint motion to suppress only noted law enforcement officials smelled "unburned" marijuana.

Addressing this last point first, I **FIND** that the government's unsworn prehearing brief does not establish that any of the witnesses' testimony regarding the odor of marijuana lacks credibility.  *See United States v. Short*, No. 4:14-CR-17, 2015 WL 75134, at *6 (E.D. Tenn. Jan. 6, 2015) (citing *United States v. Parrilla*, No. 13 Cr. 360(AJN), 2014 WL 1621487, at *4 (S.D.N.Y. Apr. 22, 2014) ("[Defendant's] assertion, contained not in his affidavit, but his memorandum of law . . . is an insufficient attorney allegation that cannot provide the Court with a basis for making a finding of fact." (internal quotation marks and citation omitted)); *United States v. Marquez*, 367 F. Supp. 2d 600, 603 (S.D.N.Y. 2005) (noting the government's factual contentions were "based on unsworn statements made by the Assistant United States Attorney in the Government's Memorandum of Law," and holding that such "attorney allegations" "cannot provide the Court with a basis for making a finding of fact."))*; see also Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (holding, in the context of a summary judgment motion, that a memorandum of law "is not evidence at all").  Nothing suggests that any of the witnesses were involved in writing or reviewing the brief.  The true issue relates to each witness's credibility in light of the evidence submitted to the Court.  *See id.*, at *1.

Defendants do not directly attack SA George's testimony about detecting the odors of both raw and burnt marijuana.[14]  Instead, they focus on SA Brewer, and his direct testimony that he could only recall detecting the odor of unburnt marijuana.  On cross examination, he acknowledged his July Affidavit mentions both raw and burnt marijuana and that his recall regarding the odors he detected would have been stronger when he drafted the July Affidavit—the same day he smelled the odors.  As a result, he testified that his July Affidavit was more accurate than his current recollection and that he must have smelled both, but could only specifically recall unburnt marijuana at the time of the hearing.  I **FIND** this to be a reasonable explanation for the noted inconsistency.

Turning to Defendants' mention of SA Lasater, as argued by the Government, even if SA Lasater only smelled burnt marijuana, his odor detection does not refute that SA George and SA Brewer detected the odors of burnt and unburnt marijuana, especially considering remnants of both were found.  Moreover, the distinction between burnt and raw marijuana adds little to the probable cause analysis.  *See United States v. Yarbrough*, 272 F. App'x 438, 443 (6th Cir. 2007)  ("We fail to understand the relevance of this distinction. Marijuana, whether burnt or burning, is illegal and contributes to a finding of probable cause."); *United States v. Bohanon*, 629 F. Supp. 2d 802, 808 (E.D. Tenn. 2009) ("The crucial point is whether [the witness] smelled marijuana, not whether the marijuana had been burned or not, and [the witness] testified consistently on that point."), *aff'd*, 420 F. App'x 576 (6th Cir. 2011).

---

[14] Defendants argue, "[e]ven the assertion that they smelled marijuana when Mr. Shinn opened the door strains credibility.  A small amount of marijuana residue is all they found inside.  Given the fact that the door was opened a foot before Mr. Shinn attempted to close it, it is highly questionable that that negligible amount of marijuana could be detected from the doorstep." [Doc. 33 at Page ID # 171].  Regardless, all of the officers testified they smelled some form of marijuana; and a small amount of marijuana was, in fact, found in Apartment 56.

Defendants also argue there was inconsistent testimony about when and from where the odor of marijuana could be detected.  SA George never wavered from his testimony that he smelled both burnt and unburnt marijuana as soon as the door opened (i.e., before he entered), though he admitted he could not smell it before the door was opened, even though he made an effort to sniff around before knocking.  Defendants attempt to question the reliability of this testimony by contrasting it with SA Brewer's testimony that he detected the odor of marijuana only after *entering* the apartment some 15 minutes later.  Defendants' argument in this regard is not persuasive.  I **FIND** it is entirely credible that when the door first opened SA George and SA Lasater could detect the odor of marijuana from just outside the barely opened doorway, where they were waiting; but by the time SA Brewer arrived (and presumably entered immediately, without pausing to knock or smell the air, as the apartment was already secured), he did not notice the odor of marijuana until he was "in" the apartment.

Defendants briefly note a lack of testimony by the witnesses that either of Defendants smelled of marijuana or exhibited any signs of having smoked the same.  However, that no party elected to solicit such information is of little consequence to judging the credibility of the evidence that was adduced—which showed that the officers smelled marijuana and that there was marijuana in the apartment.

Defendants also argue the veracity of the officers' testimony is called into question because, while SA Brewer testified on direct examination that he only learned Vaughn was not Young after Shinn had opened the door, he admitted on cross examination that "[a]t that point that it was found out that it wasn't Young, then we knocked on the door of an apartment." [Doc. 51 at Page ID # 821 (citing Doc. 37 at Page ID # 402)].  Defendants argue it is far more likely that law enforcement officials knew before approaching Apartment 56 that Vaughn was not Young because

29

it is unlikely that SA Brewer could have seen SA Ramirez arrest Vaughn, searched the neighbor, questioned the neighbor, and passed along the neighbor's information to SA George all in the time that it took for Detective Ruiz to determine that Vaughn was not Young. Although this isolated testimony of SA Brewer is potentially troubling in the credibility analysis, SA Brewer did not participate in the knock and talk. I **FIND** this testimony, which essentially stands alone, does not discredit SA George's testimony in any significant way. Moreover, in the rapidly moving and potentially dangerous situation at issue,[15] I **FIND** it is far more likely that the events transpired as claimed by all of the witnesses, except for this one response by SA Brewer.

Finally, while the quantity of marijuana found in Apartment 56 is not significant, the existence of the odor of marijuana remains uncontradicted by other evidence and is wholly believable given the presence of marijuana in Apartment 56. *See Yarbrough*, 272 F. App'x at 444 ("the term used to describe the marijuana is insignificant, as any amount of marijuana is illegal"). Even a complete absence of marijuana would not prove the odor was not present. *See Florida v. Harris*, 568 U.S. 237, 246 n.2, 249-50 (2013) (upholding a vehicle search pursuant to a drug detection dog's alert even though no illegal drugs were found because a "detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone

---

[15] For example, Officer Ramirez had the following exchange at the August 14 hearing: Q. "Do you recall whether the individuals, who went to the apartment building, had already left to go to the apartment building before Officer Ruiz arrived to make an identification or were they still there?" A. "It all basically happened kind of at the same time. I was obviously the first one on the scene, and just seconds later Ruiz and the other officers arrived. Then those other few task force officers went to the residence while Ruiz stayed with me, with the individual I put in handcuffs." Q. "At some point did Officer Ruiz determine and inform you that the individual was not the individual he was looking for?" A. "Not immediately." Q. "Okay. But did it happen?" A. "Yes. Eventually it did." Q. "Did it happen before or after the officers had left to go to the apartment building?" A. "After." Q. "Are you sure about that?" A. "I believe so, yes, sir." [Doc. 37 at Page ID # 273].

(just as a police officer's much inferior nose detects the odor of marijuana for some time after a joint has been smoked.")).

A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)); *see also United States v. Solomon*, No. 13-40-ART-(5), 2015 WL 5474395, *4 (E.D. Ky. Sept. 17, 2015) (giving "great weight" to the credibility assessment of the magistrate judge, "who personally listened to the testimony of a witness" (quoting *United States v. Johnson*, No. 10-20176, 2011 WL 3844194, at *2, 2011 U.S. Dist. LEXIS 9757, at *6-7 (W.D. Tenn. Aug. 30, 2011))). That there are some inconsistencies among the officers' testimony should be expected given the number of officers involved, the lapse of time, and the fast-moving circumstances. Were it otherwise, the Defendants would likely argue the witnesses jointly concocted and rehearsed their testimony.

For the reasons noted above, I **FIND** none of the inconsistencies render the witnesses' testimony untrustworthy, especially in the absence of any significant contradictory evidence. Assessing the inconsistencies in the witnesses' testimony and identifying the potential bias of each witness, I **CONCLUDE** they testified candidly. Moreover, the testimony is supported by the marijuana roaches and residue found in the apartment in spite of Defendants' arguments to the contrary. More specifically, and after taking into account SA George's appearance, demeanor, and consistent, descriptive account of his detection of the odors of both burned and unburnt

marijuana, I **FIND** his testimony entirely credible.  As such, the allegedly conflicting testimony does not call into question the constitutionality of the knock and talk.

Defendants also briefly argue the officers' refusal to terminate the encounter when Shinn attempted to close the door and their warrantless entry into the residence violated the Fourth Amendment, and that a protective sweep does not justify the officers' illegal actions.  Specifically, Defendants argue the protective sweep does not come within the confines of *Maryland v. Buie*, 494 U.S. 325, 327 (1990), because (1) the protective sweep was not incident to an arrest; and (2) it could not have been based on valid officer safety concerns; as it actually placed the officers more at risk.  The Government seems to take the position that the protective sweep was lawful to prevent the destruction of evidence (based on the odor of marijuana) and for officer safety reasons, but it also argues the evidence viewed during the sweep ultimately has no bearing on the motion.  The parties also dispute whether the "independent source rule"[16] applies.

_____

[16] Under *Murray v. United States*, 487 U.S. 533, 537 (1988), "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality" is admissible.  The rationale is that the later lawful search is an "independent source," (assuming it is untainted by the unlawful search).  *Id.* at 537-38.  If the protective sweep is considered an unlawful search, the July Affidavit references the unlawful search and what was discovered during it.  A valid concern in such a situation is that information from the unlawful search may have influenced or tainted the issuing judge's probable cause determination.  The Sixth Circuit has provided guidance about how to address such situations.  *See United States v. Jenkins*, 396 F.3d 751 (6th Cir. 2005).  When presented with a search conducted pursuant to a warrant, which was based on a sworn affidavit containing information collected as part of a prior unlawful search, courts are not required to simply discard the fruits of the lawful search.  *Id.* at 757-61,  Instead, any portion of the affidavit that contains unlawfully obtained information must be excised and the court must determine if the excised affidavit still supports a finding of probable cause.  *Id.* at 758.  If so, the search was valid and its resulting evidence is admissible at trial.  This rule comports with *Murray*'s reasoning, which seeks to put the government in the same position it would have been without the illegal search, if possible, and not a worse position.  *Id.*

I have already concluded that the knock and talk was not somehow tainted by Vaughn's detention, which I found to be a legal detention. Moreover, as explained below, I agree with the Government that evidence viewed during the sweep (marijuana and suspected heroin) may be excluded from the July Affidavit without eliminating probable cause for the issuance of the July Warrant. Therefore, it is unnecessary to address whether the odor of marijuana wafting from Apartment 56 provided a basis for the protective sweep, i.e., the officers' warrantless intrusion into the home, which is the "chief evil" the Fourth Amendment guards against. *See Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks omitted) (citation omitted).[17] Because the odor of marijuana alone justifies the issuance of the July Warrant as addressed below, it is not necessary to address these arguments further.

Accordingly, I **RECOMMEND** denial of this aspect of the Defendants' motion.

---

[17] Warrantless searches of a home are "*per se* unreasonable" unless an exception applies. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). However, evidence observed while lawfully securing a premise is admissible and properly included in a search warrant application. *See, e.g., Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987) (stating that visual inspection of items which come into an officer's view while he is validly searching a house's interior for a suspect pursuant to exigent circumstances does not constitute an illegal search). As a result, if the discovery of the suspected heroin and small amount of marijuana was observed in plain view from a lawful vantage point, then that discovery most certainly may properly be included in the probable cause determination for the ensuing search warrant. *See, e.g.*, *United States v. Davis*, 341 F. App'x 139, 142 n.3 (6th Cir. 2009) (stating that the discovery of a gun would have been constitutional had it been in plain view during the course of a lawful protective sweep); *United States v. Lanier*, 285 F. App'x 239, 241 (6th Cir. 2008) ("While conducting a protective sweep, an officer may seize contraband found in plain view if its incriminating character is immediately apparent." (citations omitted)). *See also Horton v. California*, 496 U.S. 128, 136-137 (1990) (holding the plain view doctrine requires the police observation to be made from a legal vantage point).

### C. The July Search

When a search warrant is obtained by state officers from a state court, but the evidence seized is ultimately to be used in a federal prosecution, the validity of the warrant is examined under the standards of the Fourth Amendment. *See, e.g.*, *United States v. Wright,* 16 F.3d 1429, 1437 (6th Cir. 1994). The Fourth Amendment states, *inter alia*, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, in order to be valid under the Fourth Amendment, a search warrant must be supported by probable cause. *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (citations omitted).

"Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence will be found in a particular place." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (internal quotation marks omitted) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)); *accord Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017);*see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (holding probable cause to conduct a search exists when there is "a fair probability that contraband or evidence of a crime will be found in a particular place.").

When determining whether a warrant is supported by probable cause, a court's review is limited to the four corners of the supporting affidavit. *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (citation omitted); *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc) ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."). Great deference is accorded to the issuing judge's determination of probable cause. *See, e.g.*, *United States v. Calloway*, 116 F.3d 1129, 1132 (6th Cir. 1997) (citation omitted) (holding the issuing judge's determination of probable

cause should not be reversed absent clear error). "[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984) (per curiam).

An affidavit supporting the issuance of a search warrant should be reviewed in a commonsense, rather than hypertechnical, manner to determine probable cause. *United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003). The sufficiency of a warrant affidavit that contains information from an unlawful search is evaluated after excising the offending information and evaluating whether what remains is sufficient to establish probable cause. *See Johnson*, 457 F. App'x at 517.

As Defendants argue, if the July Affidavit contains both falsehoods and material omissions, the determination of whether probable cause exists for the July Warrant must start with a determination of what information is properly included in the July Affidavit. As to falsehoods, Defendants argue SA Brewer falsely stated that the black male subject arrested in the parking lot was also a person with whom Metro-Nashville Officers were familiar and had warrants out of Davidson County, Tennessee. Further, Defendants argue SA Brewer falsely stated that Apartment 56 was believed to be a stash location for the person arrested in the parking lot. Also, Defendants argue that SA Brewer falsely stated Shinn said he was staying at Apartment 56 with his cousin, who was the male subject arrested in the parking lot with outstanding warrants. Defendants argue these materially false statements led the issuing judge to believe that the black male subject was Young and that Shinn was Young's cousin.

In a related argument, Defendants contend material omissions exist because SA Brewer knew—but omitted informing the issuing judge—that the detained subject was Vaughn, Vaughn

was not a sought-after fugitive, Vaughn was not a known associate of Lytle, and Vaughn did not have any outstanding warrants issued for his arrest. Defendants also argue SA Brewer made material misrepresentations by omission when he failed to reveal that (1) the "real" reason Vaughn was detained was to allow for a neighbor to direct the police to Vaughn's apartment, (2) Shinn was not a cousin of a fugitive, (3) Shinn only opened the apartment door a foot and attempted to close it upon seeing the police, but the police thwarted his efforts to terminate the encounter, and (4) very little marijuana was viewed in the protective sweep.

Originally, SA Brewer testified he believed the contents of his July Affidavit—which does not identify Vaughn by name or claim he is Young—were true. The July Affidavit is not 100% true, however, because when SA Brewer drafted it, he knew the detained subject was not Young, he knew Vaughn was not a sought-after fugitive, and he knew Vaughn had no outstanding warrants issued for his arrest. Contrary to some of Defendants' arguments, however, there is only one material affirmative *false statement* in the July Affidavit: which is, that the individual stopped in the parking lot had outstanding felony warrants for his arrest.

In addition to the noted false statement, however, I also conclude the July Affidavit creates a false *impression* that the stopped individual (Vaughn) was the sought-after fugitive—something SA Brewer knew to be false. Regarding this false impression, Defendants have submitted no argument or authority to support any claim that a false impression is the equivalent of a false affirmative statement. It is not necessary to belabor this point, however, because if the creation of the false impression—knowingly and intentionally or with reckless disregard for the truth—is considered sufficient and the false impression is excised from the July Affidavit, the remaining information nevertheless supports a finding of probable cause, as discussed in the following section.

Excising the false statement and false impression from the July Affidavit does not completely answer the initial question of what information in the July Affidavit can be properly considered in the probable cause determination. While Defendants do not seriously contest that the July Affidavit provides probable cause *if* SA George observed suspected heroin and marijuana in plain view during the knock and talk, they do contend that he had no right to push open the door to make that observation. The Court need not focus on this issue, however. *See United States v. Carpenter*, 360 F.3d 591, 596-97 (6th Cir. 2004) (en banc) ("But to be constitutionally problematic, the material must have been deliberately or recklessly omitted and must have *undermined* the showing of probable cause."). After all of the allegedly omitted information is added and the false and false impression information is deleted, the July Affidavit still provides that a knock and talk resulted in the detection of a strong smell of marijuana emanating from Apartment 56. As argued by the Government, this alone is sufficient probable cause for the issuing judge to have reasonably believed a search would uncover evidence of a crime at Apartment 56.

This very issue has been addressed recently by both this Court and the Sixth Circuit. In accepting the undersigned's report and recommendation in another case involving the odor of marijuana detected in a knock and talk, this Court explained:

> The smell of marijuana, standing alone, supports a finding of probable cause. That rule has been long established and repeatedly upheld, but in this Circuit it has only been applied in the context of vehicle searches. *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("smelling marijuana . . . constituted probable cause to believe that there was marijuana in the vehicle"); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (same). The issue in this case is whether to extrapolate that principle to home searches. The Supreme Court has held an "odor" that is "sufficiently distinctive to identify a forbidden substance . . . might very well be . . . evidence of the most persuasive character." *Johnson v. United States*, 333 U.S. 10, 13 (1948). "If the presence of [such odors] is testified to before a magistrate and he finds the affiant qualified to

37

know the odor . . . this Court has never held such a basis insufficient to justify issuance of a search warrant." *Id.* Since the Supreme Court has held the question open, the lower courts have stepped in and addressed the issue.

The Sixth Circuit has indicated, albeit in dicta, that it "may be true" the smell of marijuana standing alone supports probable cause to search a home. *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002); *United States v. Yarbrough*, 272 F. App'x 438, 443 (6th Cir. 2007) (same) (citing *Elkins*). The Sixth Circuit is not alone in that conclusion. A majority of courts are in accord, holding the same. *United States v. Correa*, 347 F. App'x 541, 545 (11th Cir. 2009) ("The marijuana the agents smelled emanating from inside the houses provided probable cause to request and to issue the search warrants"); *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1260 (10th Cir. 2008) (holding "frequent observations of the smell of burning marijuana coming from Defendant's apartment, verified on four separate occasions by a trained police officer … was sufficient to support a finding of probable cause" to issue a warrant); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. McKeever*, 906 F.2d 129, 132 (5th Cir. 1990) ("Distinctive odors, detected by those qualified to know them, may alone establish probable cause" for a search warrant); *State v. Watts*, 801 N.W.2d 845, 854 (Iowa 2011) (holding the smell of marijuana in an apartment hallway which became "overpowering" after defendant opened his apartment door "provided probable cause for issuance of the warrant"); *Gompf v. State*, 120 P.3d 980, 986 (Wyo. 2005) (holding the smell of marijuana while lawfully inside a home in a common area supported "probable cause to justify the issuance of the search warrant"); *State v. Beeken*, 585 N.W.2d 885, 449 (Neb. 1998) (holding "the smell of burning marijuana by a qualified person" supports probable cause to obtain a warrant); *State v. Rein*, 923 P.2d 639, 640 (Or. 1996) (holding, after excising unlawfully obtained evidence from affidavit, the smell of marijuana standing alone was sufficient evidence to support probable cause); *State v. Arpin*, 448 A.2d 1334, 1340 (Conn. 1982) (holding the smell of marijuana emanating from packages delivered to a home supported probable cause to issue a warrant); *see also United States v. Kerr*, 876 F.2d 1440, 1444 (9th Cir. 1989) ("By far the most incriminating piece of evidence was the odor of marijuana emanating from [defendant's] premises."); *but see State v. Huff*, 92 P.3d 604, 610–11 (Kan. 2004) (holding because it was unsettled under Kansas law

38

whether the smell of marijuana standing alone supported probable cause, such evidence "would not have guaranteed issuance of a warrant").

Defendant argues that the Court should depart from the majority rule and not extend the plain smell doctrine to the search of homes because under the law the home is afforded more protections than vehicles. And Defendant is correct, homes are afforded more protection under the law, but that increased protection is found in the Constitution's warrant requirement, not a special, heightened version of the probable cause standard. In other words, the primary difference between the two situations, home versus vehicle searches, is *who* gets to make the probable cause determination, not *what* constitutes probable cause.

In the context of vehicles, due in large part to their mobility, police officers have the authority to unilaterally decide whether they have sufficient probable cause to conduct a search of a vehicle. *See Carroll v. United States*, 267 U.S. 132 (1925). In the context of homes, on the other hand, a warrant is required, which puts the probable cause determination in the hands of a neutral and detached magistrate, rather than the police acting alone. It is not the case that the probable cause calculus somehow changes or is subject to a higher standard in the warrant context. Probable cause is probable cause, and Defendant has not proffered a logical distinction as to why that standard is different for home searches than it is for vehicles.

*United States v. Rounsaville*, No. 1:17-CR-69-4, 2018 WL 4909903, at *6–7 (E.D. Tenn. Oct. 10, 2018) (Mattice, J.), *premature app. dismissed,* No. 18-6192, 2018 WL 7290796 (6th Cir. Dec. 14, 2018).

In a very recent, albeit unpublished, decision, the Sixth Circuit addressed a similar issue in the context of an appeal from a denied motion to suppress. *United States v. Porter*, 774 F. App'x 978 (6th Cir. Aug. 19, 2019). In *Porter*, police approached a mobile home to execute an arrest warrant. "When they knocked, a woman answered the door, and, for the first time, the officers smelled the telltale odor of marijuana emanating from the home." *Id*. at 978. Mr. Porter came out to the porch, and he was arrested pursuant to the outstanding warrant. In questioning, Mr. Porter

39

admitted that he had smoked marijuana the night before and that there might still be a "blunt" in the residence. Mr. Porter denied consent for a full search of the residence so the officers sought a search warrant. When the search warrant arrived, the officers searched and found two burnt marijuana cigarettes, a scale, two guns, and ammunition. *Id.* at 979.

On appeal, Mr. Porter argued that (1) the warrantless entries into his home to secure it were unlawful, (2) the warrant affidavit deliberately omitted the material fact that the officers saw no contraband when they secured the home, and (3) the warrant affidavit lacked probable cause. *Id.* For the sake of argument, the Sixth Circuit granted Mr. Porter points one and two and asked only "whether the final, warrant-supported search was an independent source of the evidence free of any illegal taint." *Id.* (citing *Murray*, 487 U.S. at 537-38). In granting point one, the court redacted any supporting information derived from the warrantless entries, and in granting point two, the court added the facts that Mr. Porter says should have been included, then the court assessed whether the affidavit still showed probable cause. *Id.*

The *Porter* court held the affidavit showed probable cause because "[w]hile arresting Porter on the front porch of his free-standing home in a residential neighborhood in the very early morning, three officers smelled a strong odor coming from within the home and recognized it as the distinctive fragrance of marijuana, which is not permitted for medical or recreational use in Tennessee. This total set of circumstances established at least a fair probability that the home contained evidence of a crime." *Id.* (citing *Gates*, 462 U.S. at 238; *Johnson*, 333 U.S. at 13; *Foster*, 376 F.3d at 588). That the officers who secured the home saw no contraband made no difference to the probable cause calculus, the court held.

Similarly, in this case, if the Court were to (1) excise from the July Affidavit (a) that the agents saw marijuana residue/roaches and suspected heroin and (b) any reference to the fugitive

40

investigation/arrest warrants, and (2) add that (a) Shinn quickly attempted to end the knock and talk encounter and (b) Vaughn was not the fugitive with outstanding warrants, it simply would not change the outcome of the probable cause determination.  Probable cause exists because the July Affidavit still states SA George detected the strong odor of marijuana emanating from Apartment 56 upon the door being opened.

Although not argued by Defendants, I note that the July Affidavit fails to address SA George's olfactory acuity, experience, and qualifications to detect odors of marijuana, but this failure does not change the outcome.[18]  *See, e.g., Rounsaville*, 2018 WL 4909903, at *7 ("If one reads an affidavit in a realistic and common sense fashion, "inherent in [an] officer's statement that he smelled marihuana" is that he is "familiar with that substance's odor." (quoting *United States v. Ludwig*, 508 F.2d 140, 142 (10th Cir. 1974)); (citing *United States v. Talley*, 692 F. App'x 219, 222 (6th Cir. 2017) (holding the panel was not aware of any case law that required "an officer to attest that he has specialized training in detecting marijuana's order before" his claims that he smelled it are given weight); *United States v. Carr*, 92 F.Supp.2d 1137, 1141 (D. Kan. 2000) (holding officer's affidavit claiming he smelled marijuana emanating from defendant's apartment supported probable cause for a warrant, even though the affiant did not attest to his training or experience with the smell of marijuana))).  What the Defendants in this case are left with is an argument that the officers did not credibly establish that they smelled the odor of marijuana

---

[18] The July Affidavit does contain strong evidence of SA Brewer's olfactory acuity, experience, and qualifications to detect odors of burnt or raw marijuana, but not SA George's.  During the hearing, SA George testified about his extensive training and experience detecting the odor of both raw and burnt marijuana.

41

emanating from Apartment 56. I respectfully disagree with this argument for the reasons noted above.

Finally, Defendants' attempt to distinguish *Rounsaville* and *Porter* are not persuasive, and their citation to *People v. Hill*, Ind. No. 853-2017 (N.Y. Sup. Ct. July 25, 2019) [not available in Lexis or Westlaw but provided at Doc. 51-1][19] does not persuade me otherwise. In *Hill*, the court stated "[t]his case illustrates why the time has come to reject the canard of marijuana emanating from nearly every vehicle subject to a traffic stop. So ubiquitous has police testimony about odors from cars become that it should be subject to a heightened level of scrutiny if it is to supply the grounds for a search." [Doc. 51-1 at Page ID # 831 (page 7 of the decision)]. As argued by the Government, *Hill* is a trial court decision from Bronx County, New York, that applies a legal standard contrary to established Sixth Circuit precedent. Moreover, unlike in this case, the testifying officer's testimony in *Hill* was found to be "incredulous." [*Id.*]. The *Hill* court also noted its findings that the testifying officer's narrative was improbable and could not be credited were informed by the officer's prior misconduct citations and discipline related to two prior stops [*id.* at Page ID # 832 (page 8 n.7 of the decision)]. No such circumstances have been shown here.

Nevertheless, apparently in an attempt to bolster their reliance on *Hill*, Defendants make a passing reference indicating they believe SA Brewer is similarity suspect [Doc. 51 at Page ID # 822 n.4 (citing *United States v. Perkins*, No. 4:16-cr-20, Doc. 33 at Page ID # 320, 327 (E.D. Tenn., Order entered July 5, 2017)]. Contrary to Defendants' suggestion, in *Perkins* SA Brewer

---

[19] The New York Times published an article about the *Hill* decision on September 12, 2019. *See* Joseph Goldstein, *Officers Said They Smelled Pot. The Judge Called Them Liars.*, N.Y. Times, Sept. 12, 2019, *available at* https://www.nytimes.com/2019/09/12/nyregion/police-searches-smelling-marijuana.html. However, as far as I can tell, no court has ever cited to or relied on *Hill*.

truthfully testified he failed to read the anticipatory warrant, which resulted in his being unaware of the triggering event. The facts of *Perkins* are not remotely similar to the facts of *Hill*, where the court essentially found the officer had a track record of dishonesty and had staged evidence.

Moreover, and as argued by the Government, Defendants have not focused on SA George's credible testimony regarding the odor of marijuana or shown that SA Brewer, as the affiant, falsely reported SA George's detection of the odor. As held in *Rounsaville* and *Porter*, a finding of probable cause for the July Affidavit may be based solely on SA George's credible detection of "the very strong of marijuana emitting from the interior of the residence" as Shinn opened the door.

Therefore, Defendants' argument that the July Warrant is not supported by probable cause motion should be rejected. It is unnecessary to address the parties' alternative arguments since I **FIND** the July Warrant is supported by probable cause even after the false information/impression is excised and the omitted information is added.

Accordingly, I **RECOMMEND** denial of this aspect of the Defendants' motion.

### D.     December Search

Defendants contend the December Affidavit makes clear that SA Brewer knew who Vaughn was before he left to draft his July Affidavit and procure the July Warrant, that he knew Vaughn was not the searched-for black male with outstanding warrants, and that Vaughn had only been arrested for purposes of allowing SA Brewer to obtain the July Warrant. They do not, however, contend there is any basis for finding the December Affidavit lacks probable cause to search a seized cell phone if the fruits of the July Warrant are not suppressed. For the sake of clarity, however, I **FIND** the December Affidavit does provide probable cause for issuance of the December Warrant.

43

## IV.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[20] that Defendants' motion to suppress [Doc. 25] be **DENIED**.

    **ENTER:**

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[20] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure.  Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).  The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.  *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation marks and citation omitted).  Only specific objections are reserved for appellate review.  *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).